## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL HANNAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-1365 |
| | § | |
| LONG-TERM DISABILITY INSURANCE | § | |
| PLAN FOR ELIGIBLE EMPLOYEES OF | § | |
| LOCKHEED-MARTIN CORP., *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

This case involves the denial of long-term disability benefits. Like many such cases, it presents a sad combination of illness, timing, and insurance policy language. Plaintiff, Michael Hannan, suffered a disabling stroke on June 26, 2002. He had been insured under the disability plan (the "Plan") provided through his employer, Lockheed Martin Corporation, since May 7, 2002. The insurer and Plan administrator, the Life Insurance Company of North America ("LINA"), denied coverage on the basis of a preexisting condition limitation. Hannan sued, challenging the denial under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.* Hannan has moved for partial summary judgment that LINA wrongfully denied long-term disability benefits. (Docket Entry No. 29). LINA has cross-moved for summary judgment, asserting that, as a matter of

law, it properly denied coverage on the ground that Hannan's disability was preexisting as defined by the Plan.  (Docket Entry No. 27).

Based on a careful review of the pleadings; the motions, responses, and replies; the parties' submissions; and the applicable law, this court grants LINA's motion for summary judgment and denies Hannan's motion for partial summary judgment.  A final judgment is entered by separate order.   The reasons for these rulings are stated below.

I.    **Background**

A.    **The Plan**

On April 15, 2002, Hannan was hired by Lockheed Martin Corporation as an engineer project manager.  On May 7, 2002, Hannan became a participant in the Lockheed Martin Group Benefits Plan, Plan No. 594, which provided long-term disability benefits through a policy issued by LINA on January 1, 1997.  The record contains a copy of the insurance policy and a Summary Plan Description ("SPD").  The SPD explains the availability of long-term disability ("LTD") benefits.  Under the heading, "How LTD works," the SPD states in part as follows:

> To qualify for LTD benefits, you must be considered *disabled.* You are *disabled* if because of *sickness* or *injury*:
>
> •    you are unable to perform all the material duties of your own regular occupation and
>
> •    after monthly benefits have been payable for 24 months, you are unable to perform all the material duties of any occupation for which you may reasonably become qualified based on your education, training or experience.

> The *carrier* will determine whether your *sickness* or *injury* meets the definition of *disability*.  Consequently, you may be asked to provide proof of your continuing *disability* from time to time. . .

(Docket Entry No. 27, Ex. 1, p. 6).  Under "Administrative Information," the SPD again states that "the *carrier* will ultimately determine whether you are entitled to payments and authorize payment." (*Id.,* p. 16).  Under the heading, "Claim Provisions," the policy states that "failure of a claimant to cooperate with the Insurance Company in the administration of the claim may result in the termination of the claim.  Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due."  (*Id.,* Ex. 2, p. 000105).

The preexisting condition limitation ("PCL") provision in the SPD states that no long-term disability benefits will be paid for:

> a *disability* which is caused, or contributed to, by a pre-existing condition.  That is, a *disability* will not be covered if it begins during the first 12 months after your coverage becomes effective and it is contributed to or caused by an *injury* or *sickness* you had during the three months before your coverage became effective for which you:
>
> • incurred expenses
>
> • received medical treatment
>
> • took prescribed drugs or medicines, or
>
> • consulted a physician

(Docket Entry No. 27, Ex. 1, p. 6).  "Injury" is defined as "an accidental loss or bodily harm"; "sickness" is defined as "a physical or mental illness, including pregnancy." (*Id.,* p. 18).

The policy contains a preexisting condition limitation that reads as follows:

> The Insurance Company will not pay Disability Benefits for any period of Disability caused by or contributed to by, or resulting from, a Pre-Existing Condition.  A "pre-existing condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician within 3 months before his or her most recent effective date of insurance.

(Docket Entry No. 27, Ex. 2, p. 00099).

The exclusion would apply to any condition for which Hannan received medical treatment or took prescribed drugs or medicines during the three months that preceded March 7, 2002, the effective date of coverage.  If his disability was caused by or contributed to such a condition, Hannan is not entitled to long-term disability benefits.

### B.    The Facts and the Administrative Record

On June 26, 2002, less than two months after he became insured by LINA, Hannan suffered a severe stroke.  The record reveals that he sustained a left middle cerebral artery cerebrovascular accident with right hemiparesis.  Hannan was hospitalized for an extended period, then transferred to a rehabilitation facility, where he remained until November 5, 2002.  The parties agree that Hannan is disabled as defined by the Plan.  The issue is whether his claim is subject to the preexisting condition limitation provision.

As a result of the stroke, Hannan had no memory of his prior medical history and could not complete the claim documents.   On July 17, 2002, Hannan's brother, Terry Hannan, filed a claim for long-term disability benefits on his behalf.  On October 10, 2002, a LINA case manager, Shannon Parrish, sent Hannan a letter that stated in part as follows:

> Because your disability occurred within the first twelve months of your coverage, it is necessary for us to investigate your past medical history.  This routine investigation is conducted in accordance with the Pre-Existing Condition clause in your policy.

(Docket Entry No. 27, Ex. B, p. 00302).  Terry Hannan signed the forms but was unable to complete the Disability Questionnaire section asking about prescription drugs that Hannan had taken during the exclusion period, the three months from February 7, 2002 through May 6, 2002.

LINA received the discharge summary from The Institute of Rehabilitation and Research ("TIRR"), prepared by Dr. Gerrard Francisco on November 5, 2002.  The summary reads:

> HISTORY OF PRESENT ILLNESS: Mr. Hannan is a 59-year-old white male who was transferred from Las Colinas Medical Center, to Medical City Dallas Hospital, on June 26, 2002, after an acute left middle cerebral artery cerebral infarction.  He had a prior cerebrovascular accident ["CVA"] two years ago, in which he was admitted with slurred speech, and right-sided weakness.  CT scan of the head was performed revealing left middle cerebral artery infarction without hemorrhage.   He had a decreased level of consciousness, was intubated, and was later extubated on July 20, 2002. . . .
>
> PAST MEDICAL HISTORY:
> 1.   Hypertension
> 2.   Morbid Obesity
> 3.   Prior cerebrovascular accident with no residual deficits

4.      Hyperlipidemia[1]

HOSPITAL COURSE: The patient underwent inpatient comprehensive rehabilitation for his brain injury. His blood pressure was controlled with his antihypertensive regimen. His diabetes was also adequately controlled; with no sliding scale insulin required. . . . [T]he patient was having some syncopal episodes, for which neurology and cardiology were consulted. Cardiology placed the patient on a Holter monitor, with results not suggesting cardiac etiology of syncope. Neurology recommended an EEG. Venous Doppler was performed and the patient was found to have a deep venous thrombosis in the right distal popliteal vein, as well as in the peroneal and posterior tibial veins, so there was some degree of chronicity. He was, therefore, placed with an inferior vena cava filter on November 1.[2]

FINAL DIAGNOSES AND IMPAIRMENTS INCLUDING PAIN:
1.      Status post comprehensive rehabilitation for left cerebrovascular accident with dense right hemiparesis and aphasia as well as dysphagia[3]
2.      Type-II diabetes
3.      Elevated cholesterol
4.      Hypertension
5.      Chronic renal insufficiency
6.      Slight increase in distal right upper extremity tone

---

[1] Cerebrovascular accident, commonly called a stroke, is an interruption of the blood supply to any part of the brain, often resulting in damaged brain tissue. Hyperlipidemia is the presence of excess fat or lipids in the blood. Merriam-Webster Medical Dictionary, available at http://www.nlm.nih.gov/medlineplus/dictionaries.html.

[2] Syncope is the loss of consciousness resulting from insufficient blood flow to the brain Thrombosis refers to the formation or presence of a blood clot within a blood vessel. Vena cava refers to either of two large veins by which the blood is returned to the right atrium of the heart. Inferior vena cava refers to the largest vein below the heart. Vena cava filters are permanent metal filters that are inserted into the inferior vena cava to prevent large blood clots from reaching the pulmonary arteries and causing a pulmonary embolism. Merriam-Webster Medical Dictionary, available at http://www.nlm.nih.gov/medlineplus/dictionaries.html.

[3] Hemiparesis refers to muscular weakness or partial paralysis, restricted to one side of the body. Aphasia is the loss or impairment of the power to use or comprehend words, usually resulting from brain damage. Dysphagia refers to complications in swallowing. Merriam-Webster Medical Dictionary, available at http://www.nlm.nih.gov/medlineplus/dictionaries.html.

(Docket Entry No. 27, Ex. 4).

On November 22, 2002, Parrish sent Terry Hannan a letter apologizing for the delay in making a decision on Hannan's claim. The letter stated, "as you are aware, we are in need of additional information to complete our investigation." In the letter, Parrish noted that Terry Hannan had requested additional information from Blue Cross/Blue Shield. (Docket Entry No. 27, Ex. B, p. 000259). On December 13, 2002, Parrish sent an e-mail to Donna Graves, a LINA employee, stating as follows:

> Due to his condition, [Hannan] is not able to remember his prior medical history or physician's information to allow us to complete our investigation. His brother and sister-in-law are trying to help by requesting information from his Health Care Provider, but this is taking some time. We have established that Mr. Hannan has had a related condition in the past two years, and it is very likely that he was taking medications for related condition(s) during the PCL period. I'm sending a letter explaining everything to his brother, and if they are able to obtain information to the contrary, they can appeal the decision and provide that information.

(*Id.*, p. 000257). On December 17, 2002, Linda Hannan sent Parrish a fax relaying the information that Blue Cross/Blue Shield had provided. During the three-month exclusion period, Hannan had seen Dr. Irving Huber, a general practitioner, for an upper respiratory infection, and had filled prescriptions for nine different medications. Records from Ralph's Pharmacy for the prescription medications Hannan had purchased from January 1, 2001 to December 15, 2002 showed the name of the drug, the quantity, and the date. Dr. Huber had prescribed five medications, including several obviously for a respiratory infection, such as

an inhaler and amoxicillin.[4]   In addition, the records showed a number of medications

prescribed by Dr. Joanne Calabrese, including  four entries for thirty tablets of Plavix on the

following dates: December 17, 2001; January 21, 2002; February 21, 2002; and March 29,

2002.  (Docket Entry No. 27, Ex. B, p. 000254).[5]  Parrish looked up Plavix in the Nursing

Drug Handbook ("NDH") and consulted with Lory Barker, a registered nurse, who works

as a team leader in the LINA claims department.   After conferring with Barker, Parrish

denied Hannan's claim.  The denial letter, dated December 20, 2002, states in part as follows:

> According to the hospital discharge summary provided by
> TIRR, dated November 5, 2002, you suffered a mild cerebral
> artery cerebrovascular accident (CVA) with right hemiparesis.
> This report also indicates you had a prior CVA two years ago in
> which you were admitted with slurred speech, and right-sided
> weakness.
>
> On December 17, 2002, we received pharmacy records from
> Ralph's Pharmacy.  According to these records, you purchased
> Plavix on February 21, 2002, and March 29, 2002.  According
> to the 2002 Nursing Drug Handbook (NDH), Plavix is
> prescribed to "reduce atherosclerotic events in patients with
> atherosclerosis documented by recent CVA, MI, or peripheral
> arterial disease."[6]

---

[4] The prescriptions include Viagra, Albuterol Inhaler, Methylpred.Dosebak, Promethazine with Codeine, and Trimox (Amoxicillin).

[5]  Plavix is the brand name for Clopidogrel, an antiplatelet drug. The other prescriptions included Zestril and Verapamil.

[6]  Arteriosclerosis is a chronic disease characterized by abnormal thickening and hardening of the arterial walls with resulting loss of elasticity.  Fatty deposits occur in the inner lining of the arteries, and atherosclerotic plaque (a mass consisting of fatty deposits and blood platelets) develops. Atherosclerosis refers to arteriosclerosis characterized by fatty deposits in and fibrosis of the inner layer of the arteries.  Peripheral arterial disease is a circulatory problem in which the arteries supplying blood to the limbs become clogged or partially blocked.  Merriam-Webster Medical Dictionary, available at http://www.nlm.nih.gov/medlineplus/dictionaries.html.

Summary
You have been unable to work since June 26, 2002 due to a
CVA.   According  to  the  pharmacy  records  provided,  you
purchased Plavix on February 21, 2002 and March 29, 2002.
Plavix is prescribed in conjunction with the treatment of CVA's.
These dates are within the three-month period (February 7, 2002
through May 6, 2002) prior to your most recent LTD effective
date of coverage of May 7, 2002.  Based on these facts, it has
been determined that your medical condition is Pre-Existing as
defined by your policy.  Therefore, we are unable to consider
benefits payable to you.

Appeal Rights
. . .
We  be  happy  to  consider  any  medical  evidence  which
supports your total disability, and the reason why the expenses
you incurred from February 7, 2002 through May 6, 2002 were
not for treatment of a Pre-Existing Condition.  Medical evidence
includes, but is not limited to: physician's office notes, hospital
records,  consultation  reports,  test  result  reports. . . .  These
medical records should cover the period of February 7, 2002
through May 6, 2002.

(Docket Entry No. 27, Ex. B, pp. 000250-52).  On December 23, 2002, Terry Hannan

requested a copy of the insurance policy and any plan summaries distributed to Lockheed

Martin employees.  A handwritten note on the request letter indicates that "the Policy was

already sent w/ denial ltr.  No SPDs to send."  (*Id.,* p. 000248).

On February 10, 2003, counsel for Hannan appealed LINA's denial, but did not

submit any medical records or other information.  The appeal letter prepared by Hannan's

counsel states in part as follows:

As I am sure you are aware, the meaning, and scope, of "injury," "sickness," "illness," and "disease," and other terms used in pre-existing condition exclusionary clauses have been the subject of much litigation. Thus, you should be aware that the law distinguishes between the term "sickness" and the terms "illness" and "disease." The latter two terms are generally interpreted to include conditions which exist within a person's body, but for which no outward manifestations have occurred or are occurring. . . . The term "sickness," . . . is generally understood to denote someone who is suffering from the active manifestations of an illness or disease.

Mr. Hannan has never . . . been diagnosed as having arteriosclerosis, atherosclerosis, or any other illness or disease; not even after the 2000 incident that you describe as a prior CVA. Moreover, even assuming, *arguendo,* that Mr. Hannan had any pre-existing illness or disease, he clearly did not have any "sickness" at any relevant time prior to June 26, 2002. The incident that occurred in 2000 was quite mild, and Mr. Hannan was not "sick" as a result of that incident during any relevant time period prior to June 26, 2002. The medication that Mr. Hannan was taking prior to June 26, 2002 . . . was preventative in nature, and is taken by many people who are not suffering from any sickness. Specifically, it was not prescribed to treat any sickness since Mr. Hannan was not suffering from any "sickness" and has not suffered any manifestations of any alleged illness or disease for nearly two years.

(Docket Entry No. 27, Ex. B, pp. 000244-46). On February 10, 2003, LINA's appeal team received Hannan's claim and referred the file to Lori Barker a second time. Barker confirmed that coverage was excluded. The appeal examiner's claim notes state as follows:

CX is DX with CVA. Core team denied claim due to PCL. . . . CX purchased Plavix 21FEB02 and 29MAR02. Core team utilized the NDH which gives the following indication for this drug: to reduce atherosclerotic events in patients with atherosclerosis documented by recent CVA, MI, or peripheral arterial disease. CX has appealed through attorney who states this is a preventive medication and was not prescribed to treat any "sickness." PCL language includes expenses, medical

> treatment, care or services including diagnostic measures, took
> [sic] prescribed drugs or medicines.  Appeal is affirmed and
> appeal rights exhausted.

(*Id.,* p. 000235).  The denial letter dated February 22, 2003 stated that "[s]ince we have not

received any additional information sufficient to change our previous determination . . .

[Hannan's] claim is being denied for reasons detailed in our previous letter."  (Docket Entry

No. 27, Ex. 7).

This suit was filed to challenge the benefit denial.  Hannan argues that LINA denied

the claim on the basis of an incorrect interpretation of the preexisting condition limit

exclusion, which is subject to *de novo* review because the policy did not provide for

discretionary determinations on the part of the insurer.  Alternatively, Hannan asserts that

LINA's interpretation of the preexisting condition exclusion was an abuse of discretion.

Hannan cites to several procedural inadequacies during the review process:  LINA's denial

letter was vague and failed to identify the specific medical condition relied on; LINA's claim

manager made a medical determination without consulting a qualified medical professional;

and LINA failed to compile sufficient medical evidence to support its decision.  Hannan

contends that LINA's decision was not supported by the administrative record because there

was no evidence that he had been diagnosed with the conditions listed in the NDH and that

he took Plavix as a preventive measure, not to treat a diagnosed injury or sickness, and his

disability was not "caused by, contributed to, or resulted from" any preexisting condition.

(Docket Entry No. 29).  Hannan urges the court to rely on a report from Dr. Yatsu, a

neurologist who reviewed Hannan's medical records from 2000 and 2001.  Dr. Yatsu

discusses the May 2000 stroke and a follow-up examination in May 2001, in which Hannan's cardiologist prescribed Plavix.  Based on his review of the records, Dr. Yatsu notes that Hannan was prescribed Plavix and aspirin, antiplatelet aggregation drugs, after his 2000 stroke.  Dr. Yatsu explains that these medications are "commonly prescribed as part of a treatment regimen for patients who have suffered TIAs or minor strokes," which describes Hannah, and that he took the drugs as a "precautionary measure" against heart attack and stroke.  Dr. Yatsu opines that Hannan was not prescribed Plavix because of his prior stroke, which had not resulted in residual effects, but rather because he had diabetes, hypertension, hyperlipidemia, and obesity, which put him at increased risk for heart attack and stroke.  Dr. Yatsu concludes that because Hannan was not taking the Plavix as part of an ongoing treatment regimen for his 2000 stroke, and this prior stroke did not cause or contribute to the disabling stroke he suffered in 2002, Hannan did not have a preexisting condition under the Plan.  (Docket Entry No. 29, Ex. B).

LINA denies that this court has a legal basis to look beyond the administrative record and that the record supports the denial of benefits.  According to LINA, the administrative record supported its conclusion that Hannan's disability resulted from a preexisting "stroke-related condition."  LINA argues that Dr. Yatsu's expert report is inadmissible because it was not a part of the administrative record and that this court should not consider it because Hannan had the opportunity to submit medical evidence on appeal, but failed to do so. Although LINA objects to the admissibility of the expert report, LINA alternatively argues

that the evidence does not raise a fact issue to overcome the motion for summary judgment.

(Docket Entry No. 32).

Each argument is examined in light of the appropriate legal standards and authorities.

## II.     The Applicable Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under FED.

R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of

the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir.

2002).  The party moving for summary judgment must demonstrate the absence of a genuine

issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon*

*Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party

fails to meet its initial burden, the motion for summary judgment must be denied, regardless

of the nonmovant's response. *Baton Rouge Oil and Chemical Workers Union v. ExxonMobil*

*Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive

a motion for summary judgment by resting on the mere allegations of its pleadings.  *See*

*Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the

pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id.*

The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Cabillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

**B.    ERISA**

ERISA applies to an employee benefit plan established or maintained by an employer engaged in commerce or in any industry or activity affecting commerce.  29 U.S.C. § 1003(a); *Meredith v. Time Ins. Co.*, 980 F.2d 352, 354 (5th Cir. 1993).  Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit

plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989). An administrator must act "in accordance with the documents and instruments governing the plan." 29 U.S.C. §§ 1104(a)(1)(D); *see Pegram v. Herdrich*, 530 U.S. 211, 223 (2000)(discussing the various documents that constitute an ERISA plan). Section 1132(a)(1)(B) allows a participant in, or beneficiary of, a covered plan to seek judicial review of a denied claim "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B); *MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478 (5th Cir. 2003); *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 332 (5th Cir. 2001). Federal courts have held that, consistent with traditional insurance law, an administrator bears the burden of proof to show that the loss falls under an exclusionary clause in insurance plans governed by ERISA. *See Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1185 (10th Cir. 2004)(per curiam); *Glista v. Unum Life Ins. Co.*, 378 F.3d 113, 128-29 (1st Cir. 2004); *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d Cir. 2002) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies.").

Benefit determinations made by a plan administrator can be divided generally into two categories:  interpreting the plan terms and determining the facts underlying the benefit claim.  As to the first  category, a court reviews a plan administrator's construction of plan terms *de novo* unless the plan contains an express grant of discretionary authority; if so, those decisions are reviewed for abuse of discretion. *Aetna Health Inc. v. Davila,* 542 U.S. 200,

208 (2004)(quoting *Bruch* 489 U.S. at 115).   As to the second category, a plan administrator's factual determinations, the standard of review is abuse of discretion. *Vercher v. Alexander & Alexander, Inc*., 379 F.3d 222, 226 (5th Cir. 2004). "When applying the abuse of discretion standard, a court analyzes whether the plan administrator acted arbitrarily or capriciously.  *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002).  "An administrator's decision to deny benefits must be based on evidence, even if disputable, that clearly supports the basis for its denial." *Id*.  A decision is not arbitrary and capricious if it is supported by substantial evidence.  *MediTrust Financial Services Corp. v. Sterling Chemicals, Inc*., 168 F.3d 211, 215 (5th Cir. 1999).  "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*.  A decision is arbitrary when it is made "without a rational connection between the known facts and the decision or between the found facts and the evidence."  *Id.* (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996)). "[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness – even if on the low end." *MacLachlan*, 350 F.3d at 478 (quoting *Vega v. Nat'l Life Ins. Serv. Co.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc)).  If the plan administrator's decision is "supported by substantial evidence and is not arbitrary or capricious, it must prevail."  *Ellis v. Liberty Life Ins. Co.*, 394 F.3d 262, 273 (5th Cir. 2004).

In reviewing a plan administrator's decision under the abuse of discretion standard, federal courts are limited to the evidence in the administrative record, except for certain limited exceptions. As the Fifth Circuit has explained in an *en banc* opinion:

> Once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions. To date, those exceptions have been related to either interpreting the plan or explaining medical terms and procedures relating to the claim. Thus, evidence related to how an administrator has interpreted terms of the plan in other instances is admissible. Likewise, evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim would be equally admissible. However, the district court is precluded from receiving evidence to resolve disputed material facts – i.e., a fact the administrator relied on to resolve the merits of the claim itself.

*Vega*, 188 F.3d at 299 (internal citations omitted); *see Gooden*, 250 F.3d at 333 (explaining same). The administrative record consists of relevant information made available to the administrator prior to the filing of the lawsuit and in a manner that gives the administrator a fair opportunity to consider it. *See Estate of Bratton v. National Union Fire Ins. Co. of Pittsburgh, PA*, 215 F.3d 516, 521 (5th Cir.2000).

In this case, the summary judgment evidence includes the administrative record and the deposition testimony of Richard Lodi, a litigation specialist for LINA, who was not involved in the processing of Hannan's claim. (Docket Entry No. 27, Ex. A). Lodi confirmed that the relevant medical information in the administrative record consists of the TIRR discharge summary and the pharmacy records and that LINA based its decision on evidence that Hannan had suffered a stroke in 2000; was prescribed and purchased Plavix during the

exclusion period; and the information in the NDH about Plavix.  Hannan urges the court to include Dr. Yatsu's expert report in the summary judgment evidence, an argument addressed in the discussion below.

## III.    The Standard of Review

Hannan asserts that the "crux" of this dispute involves the legally correct interpretation of the PCL provision.  Hannan argues that this court should review LINA's denial decision *de novo* because the Plan does not grant LINA discretionary authority to interpret the terms; LINA operated under a conflict of interest; and LINA failed to conduct a full and fair review of his claim.   LINA does not dispute that its role as insurer and administrator results in a somewhat more searching standard than the usual abuse of discretion standard, but disputes that *de novo* review applies.

The abuse of discretion standard applies to reviewing a plan administrator's interpretation of the plan terms if the plan confers discretionary authority "to determine eligibility for benefits *or* to construe the terms of the plan." *Bruch,* 489 U.S. at 115 (emphasis added).  Although the Fifth Circuit requires an express grant of discretionary authority, there are no specific or formulaic words that must be used.  *See Wildbur v. ARCO Chemical Co.*, 974 F.2d 631 (5th Cir. 1992).

The parties dispute whether the SPD or the policy itself provides the controlling language.  *See Health Cost Controls of Illinois, Inc., v. Washington,* 187 F.3d. 703, 712 (7th Cir. 1999)("This kind of confusion is all to common in ERISA land; often the terms of an

ERISA plan must be inferred from a series of documents none clearly labeled as the 'the plan.'").  The SPD states that "[t]he *carrier* will determine whether your sickness or injury meets the definition of disability. . ." and "the *carrier* will ultimately determine whether you are entitled to benefits and authorize payment."  (Docket Entry No. 27, Ex. 1, p. 6, 16).  The policy states that the insured must cooperate with LINA and provide "any information or documents needed to determine whether benefits are payable or the actual benefit amount due."  (*Id*., Ex. 2, p. 00099).  Hannan argues that the policy does not confer discretionary authority and that LINA impermissibly relies on the SPD.  According to Hannan, the SPD is not a relevant plan document because LINA did not rely on it to review Hannan's claim; LINA did not write the document; and LINA was not even aware that the SPD had been distributed to employees.

Hannan's argument that this court may look only to the policy itself to determine whether there is an express grant of discretionary authority to make benefit determinations is not supported by the case law or the ERISA statute.  A "plan document" is one which a plan participant could read to determine his or her rights or obligations under the plan.  *See Pegram,* 530 U.S. at 223 ("Rules governing collection of premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan."); *Fritcher v. Health Care Service Corporation,* 301 F.3d 811 (7th Cir. 2002)(holding that administrative services agreement between the insurer and the administrator was not a relevant plan document for determining discretionary authority).  ERISA requires a summary plan description to "be written in a manner calculated

to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants . . . of their rights and obligations under the plan."   29 U.S.C. §1022(a).   The SPD must contain the plan's eligibility requirements for benefits as well as "the circumstances which may result in disqualification, ineligibility or denial or loss of benefits." *Id*. at § 1022(b).   Courts have held that all plan documents must be reviewed to determine whether discretion is granted to the plan administrator. *See Cagle v. Brunder,* 112 F.3d 1510, 1517 (11th Cir. 1997)(per curiam)("we look to all of the plan documents to determine whether the plan affords the Fund enough discretion to make the arbitrariness standard applicable").   In the event of conflicting plan documents, the SPD controls. *See McCall v. Burlington Northern/Santa Fe Co.,* 237 F.3d 506, 513 (5th Cir. 2000)*; Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir. 1991) ("if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern"); *Burke v. Kodak Retirement Income Plan,* 336 F.3d 103 (2d Cir. 2003); *see also Ruiz v. Continental Casualty Co.,* 400 F.3d 986, 992 (7th Cir. 2005).   In this case, there is no conflict between the SPD and the policy provisions at issue.

Although the policy discusses the claims process, it is drafted primarily for use by the employer and the insurer.   The SPD is intended to inform the insured of the policy provisions and terms.   Under the heading, "Disability Benefits," the policy states that the "Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy.   Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid." (Docket Entry No. 27, Ex. 2*,* p.

00098).  The SPD states that the "*carrier* will determine whether your *sickness* or *injury* meets the definition of *disability*" and "will ultimately determine whether you are entitled to benefits and authorize payment." (*Id.*, Ex. 1, p. 00057).  Courts have held that policy language requiring the employee to submit "satisfactory proof" of his or her disability grants a plan administrator discretionary authority to determine eligibility for benefits.  *See Yeaer v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380-81 (6th Cir. 1996)(the inclusion of language requiring "satisfactory proof" or "due proof" grants discretion sufficient to apply the arbitrary and capricious standard of review); *Russell v. Paul Revere Ins. Co.,* 148 F. Supp.2d 392, 400-01 (D. Del. 2001), *aff'd* 288 F.3d 78 (3rd Cir. 2001)(language requiring "satisfactory proof" implies discretion on the part of the plan administrator); *Curran v. Kempter National Services, Inc.,* 2005 WL 894840 *5 (11th Cir.); *but see Herzberger v. Standard Insurance Co.,* 205 F.3d 327 (7th Cir. 2000)(fact that plan requires satisfactory proof of the applicant's claim does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review).

The courts have held that language similar to that in the SPD issued to Hannan provides discretion to the plan administrator to determine eligibility for plan benefits and to interpret the plan terms.  The SPD states that LINA will "ultimately determine" eligibility for benefits.  Courts have distinguished between the authority to make initial benefit determinations and the authority to make final benefit determinations.  Language that grants an administrator final decisionmaking authority is usually sufficient to trigger the abuse of discretion standard.  *See Wildbur,* 974 F.2d at 637 (abuse of discretion applied when the plan

stated the administrator "shall make an independent determination of the applicant's eligibility for benefits under the Plan"); *Barhan v. Ry-Ron, Inc.,* 121 F.3d 198 (5th Cir. 1997)(abuse of discretion was the proper standard for the plan that provided that the administrator "has the sole authority and responsibility to review and make final decisions on all claims"); *see also Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1353 (11th Cir. 1998) (third-party administrator had "the authority to make ultimate decisions regarding benefits eligibility").

The SPD provides that LINA will decide whether a participant's sickness or injury meets the definition of "disabled" and "ultimately determine" whether the participant is eligible for benefits.  The record contains no indication that any plan document gives Lockheed Martin a right to participate in preliminary or final benefit determinations.  By naming LINA as the ultimate decisionmaker, the SPD grants LINA discretionary authority to determine eligibility for benefits.  This grant of authority is consistent with the discretionary authority provided in the policy.  This court concludes that the abuse of discretion standard applies because both plan documents contain language that confer LINA with discretionary authority to make benefit eligibility determinations.[7]

---

[7] LINA cites *Magee v. Life Ins. Co. of North Am.,* 261 F. Supp.2d 738, 749 (S.D. Tex. 2003), in which the court found that similar language gave discretion to the plan administrator and resulted in review for an abuse of that discretion.  Hannan asserts that this case is distinguishable from *Magee* because in that case, the court stated that the plaintiff had presented "no evidence" that the plan administrator lacked discretion under the plan.  As evidence that LINA did lack such discretion in this case, Hannon points to a July 9, 2002 draft of "Supplemental Information" that LINA wrote but did not adopt.  Under the heading, "What You Should Do and Expect if You Have a Claim," the draft states in part as follows:

Even if a plan does not grant an administrator discretionary authority, claim denials based on factual determinations are always reviewed for an abuse of discretion. *See Pierre v. Connecticut General Life Ins. Co.,* 932 F.2d 1552 (5th Cir.), *cert. denied,* 502 U.S. 973 (1991). A factual determination usually consists of an administrator's conclusion that the claimant's condition meets a particular definition in the policy. *Southern Farm Bureau Life Ins. Co. v. Moore,* 993 F.2d 98, 100-01 (5th Cir. 1993); *Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 597-98 (5th Cir. 1994)*; Bell v. American Elec. Power System Long-Term Disability Plan*, 2005 WL 646044 (N.D. Tex. Mar 21, 2005). LINA argues that its decision that Hannan had a preexisting condition that contributed to his disabling stroke is a factual determination.

In an unpublished decision, the Fifth Circuit held that a plan administrator's determination that a disability was due to a preexisting condition for which the participant received treatment within three months before the effective date of the policy was a factual, as opposed to interpretative, determination. *Collins v. Harleysville Life Ins. Co.,* 31 Fed.

---

The Plan Administrator has appointed the Insurance Company as the named fiduciary for adjudicating claims for benefits under the Plan, and for deciding any appeals of denied claims. The Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company shall be final and binding on Participants and Beneficiaries to the full extent permitted by law.

(Docket Entry No. 27, Ex. B, p. 000230). This later, unadopted draft SPD does not change the fact that the policy contains the "satisfactory proof" language that the *Magee* court found sufficient to trigger an abuse of discretion standard and the SPD that applied to Hannan gave LINA the ultimate authority to determine benefits.

Appx. 832 (5th Cir. 2002).  The plan at issue in *Collins* did not confer the administrator with discretionary authority to interpret the terms of the plan or make eligibility determinations. For purposes of the preexisting condition exclusion, the relevant exclusion period was from January 1, 1998 to March 31, 1998.  In 1997, the participant was treated for cervical spondolysis in certain vertebrae and given a prescription for pain relief.  In February 1998, the participant's pharmacy filled a prescription for the medication.  Six months after the exclusion period ended, a physician diagnosed the participant with cervical spondolysis in disks that had previously been unaffected, and concluded that the participant was disabled. The administrator denied the participant's claim for long-term disability benefits.  The court found that the administrator could have rationally concluded that the disability resulting from the diseased disk was caused or contributed to by, or resulted from, the cervical spine problem for which the participant was treated with the prescribed medication during the exclusion period.  *Id.* at *1.  *See also Harrison v. Paul Revere Life Ins. Co.,* 1994 WL 382628 *1 (E.D. La.)(administrator's decision that the participant's disability was due to a preexisting condition was a factual determination subject to review under the abuse of discretion standard).  Although the court's opinion in *Collins* does not provide a detailed analysis, it supports LINA's argument that it made factual determinations subject to review for an abuse of discretion.

In *Collins,* the court cited *Meditrust Financial Services Corp. v. Sterling Chemicals, Inc.,* 168 F.3d 211 (5th Cir. 2001), which held that the determination of whether a participant's treatment was "medically necessary" was a factual determination.  The court's

discussion further supports the conclusion that LINA's determination that Hannan had a preexisting condition should be treated as a factual determination, subject to review for an abuse of discretion.  In *Meditrust,* the plan participant had suffered head injuries in an automobile accident and received treatment at a rehabilitation facility for several years.  After regressing, the participant returned to the facility for in-patient treatment.  Based on a review of the participant's medical progress and diagnosis, the plan administrator denied coverage for the in-patient treatment, concluding that the treatment was not "medically necessary" because it was custodial, as opposed to rehabilitative.  The plan participant argued that the terms "medical necessity" and "generally accepted medical standards" were "terms of art" within the medical and insurance fields and that the decision as to whether a particular treatment was "medically necessary" involved interpretation of the terms.  The court rejected the argument that deciding whether the received treatment fit within the "medical necessity" language involved plan interpretation as opposed to a factual determination.   The court explained:

> The decision to deny benefits based on lack of medical necessity involves a review of the facts in [the participant's] hospital records and a determination of whether there is factual support for [the] claim.  The Plan's experts reviewed [the participant's] records for specific signs of medical improvement.   To determine whether further medical treatment was necessary, these doctors used their medical expertise to make a judgment about the likelihood of improvement in [the participant's] medical condition. . . . [T]hese medical assessments do not constitute an issue of contract interpretation.

*Id.* at 214 (citations omitted).  Hannan's primary argument – that he did not take Plavix for a specific "injury" or "sickness" and thus LINA erred in determining that his condition fell within the meaning of "pre-existing condition" – is similar to the argument rejected in *Medistrust.*  Deciding the medical progress of a patient through analysis of medical reports and records is similar to deciding whether a participant has a preexisting medical condition.

The Fifth Circuit cases classifying an administrator's determination that a participant's death was "accidental" as a factual determination are also instructive.  *See Pierre,* 932 F.2d at 1563-64*; Thomas v. AIG Life   Ins. Co.,* 244 F.3d 368 (5th Cir. 2001)("[T]he plan administrator did not abuse its discretion in finding that [the participant's] injury was attributable to a disease rather than an accident under the accidental death policies.").   Accidental death determinations are similar to preexisting condition determinations in that in both, the plan administrator must decide whether the insured's loss was caused or contributed to by an excluded event or condition.  *See Quisenberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1028 (4th Cir. 1993)(holding that in accidental death cases, the court should first determine whether there is a preexisting disease and second, determine whether the preexisting condition substantially contributed to the loss); *Dixon v. Life Ins. Co. of N. Am.,* 389 F.3d 1179 (11th Cir. 2004)(upholding denial of benefits because the participant's preexisting heart condition substantially contributed to his death).

In sum, because the Plan gave LINA discretion to make the benefit determination and Plan interpretation, and because a primary issue is a factual determination, an abuse of discretion is the appropriate standard of review.   Whether the issues are viewed as

interpreting plan terms or applying plan terms, this court concludes that the record provides substantial support for LINA's decision.

LINA does not dispute its conflict of interest.  If a plan administrator has a conflict of interest because it is both the plan insurer and plan administrator, courts employ a "sliding scale" approach.  Under this approach, a court applies the abuse of discretion standard but weighs any potential conflict of interest in determining whether the administrator abused its discretion.  *MacLachlan*, 350 F.3d at 478; *Gooden*, 250 F.3d at 333; *Vega*, 188 at 295.  The greater the evidence of administrator conflict, the less deferential the court's abuse of discretion standard will be.  *Vega*, 188 F.3d at 297.  In reviewing LINA's interpretation of the Plan and its ultimate decision, this court takes into consideration LINA's conflict of interest and Hannan's argument that LINA carries the burden of proof.  Because the only evidence of a conflict is LINA's position as both insurer and administrator, this court reviews the determination with "only a modicum less deference" than would otherwise apply.  *Vega*, 188 F.3d at 301.[8]

## IV.  Analysis

_____

[8]  Hannan submitted an expert report by Cal Courtney, an attorney who expressed opinions as to whether and to what extent LINA had a conflict of interest as an administrator and insurer; whether LINA correctly interpreted the preexisting condition exclusion; and whether LINA correctly applied the exclusion to the facts.  The report also purported to identify general economic impacts of the decision to deny benefits to Hannan, observing that it was favorable to LINA and unfavorable to Hannan as a beneficiary.  LINA moved to exclude this opinion.  The motion is granted.  Courtney's opinions are either opinions as to the law or matters of law, such as the  interpretation of the insurance policy, which are not an appropriate or helpful subject of expert testimony, or matters as to which no factual support is provided.

The Fifth Circuit has explained the steps involved in reviewing an administrator's plan interpretation:

> First, a court must determine the legally correct interpretation of the plan. If the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion. In answering the first question, i.e., whether the administrator's interpretation of the plan was legally correct, a court must consider: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan.

*Ellis,* 394 F.3d at 269-270 (citing *Wildbur,* 974 F.2d at 637-38).  The record does not contain any evidence as to unanticipated costs to the Plan.  The issues are whether LINA's interpretation of the preexisting condition limitation provision has been consistent and is a fair and reasonable construction of the Plan terms.

When Hannan appealed LINA's decision, his counsel argued that "illness"  meant a condition with no active or outward manifestations, while "sickness" meant a condition that did have active outward manifestations.  This argument was in turn based on the contention that Hannan had fully recovered from his 2000 stroke and was not taking Plavix in February and March 2002 to treat any "sickness."  The argument that "sickness" is different from "illness" because one has outward manifestations and the other does not is undermined by the Plan itself.  The Plan defines a "pre-existing condition" to include an "injury" or "sickness."  (Docket Entry No. 27, Ex. 1, p. 6).  In turn, the Plan defines "sickness" as "a

physical or mental illness." (*Id.*, p. 18).  The Plan defines "sickness" to include "illness" and does not distinguish between them.

Hannan argues that because he had long since recovered from his earlier stroke with no residual effects, and because he had not been diagnosed with the specific condition of atherosclerosis – one of the conditions for which Plavix is indicated and the one the LINA case manager relied on in denying coverage – LINA misinterpreted the Plan definition of "pre-existing condition" that causes a disability.  Hannan contends that the only explanation for LINA's construction of the PCL provision is that any participant who has had a prior stroke before enrolling in the Plan will be considered to have a "pre-existing condition" if a disabling second stroke occurs.  To show that LINA has not consistently applied the PCL exclusion, Hannan points to another benefit determination involving a claimant with an allegedly similar medical history.  In April 2002, LINA approved disability benefits for a claimant whose medical history included non-insulin dependent diabetes; a 1994 myocardial infarction; and a prescription for Atenolol, medication usually prescribed for hypertension and high blood pressure.  After enrolling in the Plan, the claimant had a stroke and filed a claim for long-term disability benefits.  LINA determined that the exclusion did not apply, despite the prior heart attack and the prescription medication.  Hannan argues that the comparison file shows an inconsistent interpretation of "pre-existing condition."

Lodi testified about the comparison file in his deposition.  He read the following portion of the redacted claim care notes:

>Claimant was not treated during PCL period for high blood pressure or cardiac conditions. He was put on Atenolol in '94 after his heart attack. We researched this medication and usages include beta adrenergic antagonist for use of angina as well as post MI. Office notes revealed history of diabetes and cardiac condition, the blood pressure readings were always within normal limits; therefore, claim is clear during PCL condition. Medical information in file supports disability and claim is approved.

(Docket Entry No. 27, Ex. A, pp. 84-86). Hannan relies on Lodi's statement in his deposition that, assuming the claimant had taken Atenolol during the exclusion period, the claim is factually similar to Hannan's claim. (*Id.*, p.89). LINA points out that the claimant in the comparison file, unlike Hannan, did not take prescription medication during the exclusion period for any of the underlying conditions that had caused the disabling heart attack. The comparison file shows that LINA has interpreted the Plan consistently: application of the PCL provision does not depend on whether the participant ever had a prior related illness, but on whether the claimant took prescription medication for an illness during the three month period before enrollment, and on whether that illness caused or contributed to the disability. *See Hughes v. Boston Mut Life Ins. Co.,* 26 F.3d 264, 269 (1st Cir. 1994)(distinguishing a "recent treatment" exclusion from a preexisting condition clause that bars coverage for claims arising from conditions "existing" before the effective date of an insurance policy).

Hannan argues that he took Plavix to prevent complications from illnesses that he suffered rather than to treat symptoms from his prior stroke, and that the PCL does not cover such medications. The meaning of "treatment" is not at issue; the Plan excludes coverage

for a sickness for which the participant "received medical treatment" or "took prescribed drugs or medicines" within the exclusion period, if the injury or sickness caused or contributed to the disability.  LINA's interpretation of "pre-existing condition" as including a sickness for which the participant takes prescription medication during the three months before Plan enrollment, even if the medication is taken to prevent a recurrence of, or complications from, an underlying sickness that has no "active manifestation" during the exclusion period, is fair and reasonable.  As noted, the  Plan defines "sickness" as "illness," defeating Hannan's attempt to argue that "sickness" requires active outward manifestations, while "illness" does not.  The preexisting condition limitation does not require a specific diagnosis of a disabling condition or active symptoms from a sickness during the three-month exclusion period.  *See Harrison v. Paul Revere Life Ins. Co.,* 1994 WL 382628 (E.D. La, July 18, 1994)(under the plain language of the policy, "a pre-existing condition is a disability that is caused by a sickness which requires an employee to obtain prescription drugs during the three months prior to the policy's effective date.  There is no requirement that a diagnosis of a disabling condition be made during that three month period."); *Bebo v. Minntech Corp.,* 909 F. Supp. 662 (D. Minn. 1995)(holding that the administrator's "interpretation of the pre-existing condition exclusion to require a period free of prescription drug use is reasonable and required by the clear language of the Plan").

Hannan's primary argument is based on LINA's stated reasons for denying disability benefits:  Hannan had an earlier stroke; Hannan was taking Plavix in the exclusion period; Plavix is often prescribed to reduce atherosclerosis, as documented by a prior stroke; and

Hannan had a second disabling stroke.  Relying on the expert report of Dr. Yatsu, Hannan argues that he was not taking Plavix to treat symptoms of his prior stroke or atherosclerosis, but to treat underlying conditions that put him at an increased risk of stroke.  To the extent that Hannan is challenging LINA's interpretation of the PCL provision to include medication prescribed to prevent complications or recurrences of sicknesses that do not have outward manifestations of certain complications, but do increase the risk of those complications, his challenge fails.  In *Davolt v. Ex. Comm. Of O'Reily Automative,* 206 F.3d 806 (8th Cir. 2000), the claimant, a diabetic, was preliminarily diagnosed with peripheral vascular disease, a condition associated with diabetes.  He was prescribed Trental.  For the next five years, the claimant took Trental and did not experience any complications of vascular disease.  In 1995, the claimant enrolled in the defendant's group benefit plan, which excluded coverage for conditions "that were diagnosed or treated" in the six months before enrollment.  In 1996, the claimant underwent heart surgery.  The court of appeals reversed the district court's holding that the Trental prescription did not trigger the preexisting condition exclusion and held that benefits were properly denied. Although the claimant's heart condition was originally diagnosed and treated in 1991, the condition continued to exist and was the reason for the prescription drug taken during the exclusion period.  *Id.* at 810.  Similarly, LINA reasonably applied the PCL provision to sicknesses for which the claimant took  medication during the exclusion period even if the medication was taken to prevent complications from the underlying sicknesses.  The PCL provision does not make an exception for "preventive" medications.

This court concludes that LINA used a legally correct definition of "pre-existing condition."  This court must now determine whether the administrative record provided a reasonable basis for LINA to deny Hannan's claim.  An administrator's decision to deny benefits must be "based on [concrete] evidence, even if disputable, that clearly supports the basis for its denial." *Vega,* 188 F.3d at 299.

Hannan's medical records show that he had suffered a stroke in 2000 and had no residual effects.  He had a second, disabling stroke in 2002.  He also had diabetes, was morbidly obese, and had hypertension.  He was prescribed Plavix and purchased it on February 21, 2002 and on March 29, 2002.

Although Hannan did not suffer residual functional deficits as a result of the 2000 stroke, the prescription of Plavix after that stroke, including during the three-month exclusion period in 2002, provides ample basis for LINA's conclusion that the underlying medical conditions that put him at high risk for stroke continued to exist.  As LINA points out, the claim manager conferred with a registered nurse during the initial examination of Hannan's claim and on appeal, and that the nurse consulted a recognized medical authority, the NDH, which states that Plavix is prescribed to "reduce atherosclerotic events in patients with atherosclerosis documented by recent CVA, MI, or peripheral arterial disease."  *See Bebo,* 909 F. Supp. at 666-667(rejecting argument that plan administrator's reliance on pharmacy record for prescription of Aerobid Inhaler System was unreasonable because the pharmacy record did not establish the purpose for which the drugs were prescribed).

Hannan urges this court to consider the medical opinion of Dr. Yatsu, in order to clarify the medical terms and conditions at issue.  *See Vega,* 188 F.3d at 299.  Adding this opinion to the summary judgment record does not raise a fact issue material to determining whether LINA's decision was arbitrary or capricious.  Although Dr. Yatsu opines that Hannan did not suffer from a preexisting condition, his report does not contradict the facts that LINA relied on to resolve the claim.[9]  The expert report contains a discussion of Plavix and the various medical conditions that Hannan had at the time the Plavix was prescribed in 2001.  Dr. Yatsu describes the May 2000 stroke as a minor lacunar stroke, due primarily to hypertension.  The CT scan performed after the stroke showed evidence of "white matter hypodensities, most commonly due to small vessel disease."  During a follow-up examination in May 2001, Hannan's cardiologist noted that he was diabetic, hypertensive, obese, and suffering from hyperlipidemia.  The physician prescribed Plavix, Verapamil, Zestril,

---

[9]  LINA moved to exclude Dr. Yatsu's report.  That motion is denied to the extent that the report clarifies and explains medical terminology.   Dr. Yatsu's report focuses on the connection between the 2000 CVA and the 2002 CVA– as opposed to the connection between the underlying sicknesses for which Hannan was prescribed Plavix during the three-month exclusion period and the 2002 CVA.  Hannan relies on Lodi's statement during his deposition that LINA considered the preexisting condition to be the CVA in 2000.  Lodi was not involved in the review of Hannan's claim; he merely answered questions based on the documents in the administrative record.  The denial letter sent to Hannan did not identify the 2000 CVA as the preexisting condition.  Instead, the denial letter indicates that LINA had considered the 2000 CVA as evidence of a preexisting condition.  LINA identified the reasons for its decision and Hannan did not submit any medical records to complete the administrative record. (Docket Entry No. 27, Ex. B, pp.000252).  Hannan's reliance on Dr. Yatsu's opinion for purposes other than clarifying medical terminology.  "[W]ith respect to material factual determinations – those that resolve factual controversies related to the merits of the claim – the court may not consider evidence that is not part of the administrative record."  *Vega,* 188 F.3d at 300. As the discussion makes clear, however, even considering Dr. Yatsu's report in its entirety does not show that LINA abused its discretion in denying Hannan's claim for disability benefits.

Glipizide, Ecotrin, and Viagra, as needed, and told Hannan that he may need "a lipid lowering agent plus an increase in his anti-hypertensive medications." (Docket Entry No. 29, Ex. B, p. 3).  Dr. Yatsu notes that at the time of the May 2001 examination, Hannan was able to perform the usual activities of daily living without symptoms.  He also acknowledges that Hannan was prescribed Plavix to treat vascular disease:

> [T]he minor stroke that Mr. Hannan suffered in May of 2000 was temporary or transient, and he recovered completely from that event with no disability, and he had no need for continuing treatment nor care for that transient episode, but *required therapies for his continuing medical conditions of hypertension and diabetes mellitus*.  The medications that were prescribed for Mr. Hannan prior to June 26, 2002, namely aspirin and plavix, were not for treatment nor care of any persisting stroke-related injury, condition, nor sickness.  Rather these medications were prescribed as a general prophylaxis against the development of *complications from vascular disease, such as heart attacks and strokes, which are known to be increased in subjects with hypertension, diabetes mellitus, hyperlipidemia and obesity*.

(Docket Entry No. 27, Ex. 4, p. 4)(emphasis added).  Although Hannan had recovered from the 2000 stroke without residual deficits, Dr. Yatsu acknowledges that the Plavix was prescribed because Hannan was at increased risk for stroke as a result of his underlying medical conditions – hypertension, diabetes mellitus, hyperlipidemia, and obesity – which are "known to be major risk-factors for athersclersis [sic]."  The PCL provision did not require that Hannan receive the Plavix for active treatment of persistent neurological deficits resulting from his prior stroke.[10]

---

[10]  *Royer v. Southern Health Plan, Inc.,* 857 F.Supp. 42 (W.D. Tenn. 1994) is instructive. In *Royer,* the participant had bypass surgery as a result of coronary artery disease.  After enrollment

Dr. Yatsu states that the first stroke did not cause the second, disabling stroke, but that was not the basis of LINA's decision to deny disability benefits.  Dr. Yatsu confirmed that in May 2001, Hannan's physician prescribed Plavix to reduce the increased risk of heart attack and stroke resulting from the underlying sicknesses that the physician at TIRR also identified. (Docket Entry No. 27, Ex. 4, p. 5).

Given the objective medical evidence in the administrative record for the denial, Hannan has failed to raise a disputed fact issue material to determining whether LINA's decision to deny coverage was arbitrary or capricious.  LINA reasonably concluded that Hannan purchased Plavix during the exclusion period for sicknesses that caused his disabling

---

in the plan, the bypass grafts had become blocked, resulting in a second surgery.  The administrator denied coverage under the preexisting condition provision that excluded coverage for "services, supplies, or charges for a condition, disease, or illness, whether known or unknown, that existed in any degree prior to the effective date of coverage."  After the initial denial, the participant's cardiologist, submitted a letter to the administrator explaining that the preexisting condition definition did not apply to the participant's condition:

> Mr. Royer was admitted to Methodist Hospital on 11-09-92 because of the acute onset of chest pain. Subsequent catheterization studies revealed a recurrence of his coronary artery disease.  His pain was of recent onset, and even though he was known to have coronary artery disease. . . he had been free of symptoms and had no knowledge of any further difficulty until just prior to this admission. He had been without any symptomatology until November, 1992. Therefore, his insurance should not be denied on the basis of pre-existing disease. His recent reoccurrence of graft disease probably was not present at the time he took out IPA insurance.

*Id.* at 44.  The court, reviewing the record *de novo,* concluded that the participant's claim was properly denied under the preexisting condition limitation and noted that the cardiologist's opinion supported the denial.  Dr. Yatsu's opinion resembles the cardiologist's letter in *Royer* to the extent that he focuses on an interim period of no symptoms and attempts to disassociate an underlying condition from the recurrence of complications caused by the condition.

stroke. *See Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335 (4th Cir. 2000)(holding that despite arguments made by the claimant's physician that the claimant did not have a history of heart conditions, the administrator acted reasonably in denying claim for cardiac procedures when the medical history revealed treatment for a heart condition); *Wright v. Matrix Absence Management, Inc.,* 2005 WL 475173 (E.D.Pa., Mar. 01, 2005)(administrator properly denied claim for stroke where the claimant had history of prior minor strokes and took two hypertension prescription drugs during the exclusion period).

Hannan cites to *Fought v. UNUM Life Ins. Co. of America*, 357 F.3d 1173 (10th Cir. 2004), *cert. denied,* 125 S.Ct. 1972 (2005), in support of his argument.[11]  Fought was diagnosed and treated for coronary artery disease during the exclusion period.  After enrolling in the plan, Fought underwent an angioplasty.  A few days after her release from the hospital, Fought developed a staph infection on her surgical wounds that required additional operations.  Based on the staph infection, Fought filed a claim for long-term disability benefits.  The plan excluded "any disabilities caused by, contributed to by, or resulting from" a "pre-existing condition."  The plan defined "pre-existing condition" as any

---

[11]    *Fought* involved an interpretative dispute over the language of the PCL provision, whether "caused by, contributed to by, or resulting from" means "but for."  In *Fought,* the administrator excluded benefits for a unrelated condition that was caused by an intervening surgery. There was no dispute that but for the coronary artery disease, the staph infection would not have occurred.  *Fought,* 379 F.3d at 1009-10("UNUM seems to suggest that it need not cover anything for which it can construct a but/for story.").  To the extent that Hannan argues that LINA misconstrued the PCL provision by failing to engage in a formal analysis of causation, he is arguing that LINA's review of his claim was procedurally flawed, not that it used a flawed policy interpretation.

condition for which the participant "received medical treatment, consultation, care or services including diagnostic measure or took prescribed drugs or medicines" in the three months before the effective date of coverage.  The plan administrator denied Fought's claim for the staff infection on the basis that her preexisting coronary artery disease "contributed to" the staph infection.  The court described UNUM's denial as an attempt to apply a policy that excluded coverage *for disabilities caused by pre-existing conditions,* as if it excluded coverage for *disabilities caused by complications from surgery for preexisting conditions.* The court held that an exclusion for disabilities caused by, contributed to by, or resulting from a preexisting condition requires more than "but for" causation.  Fought's staph infection resulted from the surgery (and several intervening complications); "surgery is not, of course, a pre-existing condition, but at most a necessary consequence of a pre-existing condition." *Id.* at 1009.

In this case, the medical evidence in the administrative record is consistent with Dr. Yatsu's expert report.  Hannan had a history of stroke and underlying sicknesses – hypertension, diabetes mellitus, hyperlipidemia, and obesity – that put him at a continuing increased risk for atherosclerosis and future strokes.  He was prescribed antiplatelet aggregation drugs because he was at an increased risk of heart attack and stroke from these underlying sicknesses.  He had a disabling stroke that the medical record stated was a result of these underlying conditions.  The causal relation between Hannan's underlying conditions and his disabling stroke is wholly different from the lack of connection between the heart disease,  surgery, and staph infection resulting from the surgery, that was at issue in Fought.

Dr. Yatsu's report and the medical records are consistent: Hannan's stroke was not a separate and distinct injury, but a result of his sickness that increased the risk of strokes and heart attacks.  This case is similar to the cases cited by the court in *Fought* to distinguish a denial of benefits based on well-known complications of a preexisting illness.  *See Cash v. Wal-Mart Group Health Plan,* 107 F.3d 637 (8th Cir.1997)(denial of benefits was reasonable because diverticular disease was a "necessary precursor" to the later illness of diverticulitis); *Holsey v. UNUM Life Ins. Co. of Am.*, 944 F.Supp. 573, 579 (E.D. Mich. 1996)(excluding coverage for blindness as a disability resulting from the participant's diabetes); *see also Wright,* 2005 WL 475173 (E.D. Pa.)("[T]he participant attempts to avoid the indisputable by arguing that the later diagnosis of malignant hypertension was a new diagnosis unrelated to the previous diagnosis of hypertension."); *Dixon,* 389 F.3d at 1182 n.1 (rejecting the argument that it was erroneous to equate "cardiac arrest" with "thrombotic occlusion" and "cardiac arrhythmia" when it was undisputed that the insured's loss resulted from heart failure).

Given the medical evidence in the record, LINA did not adopt an unreasonable or overly broad interpretation of the PCL provision or apply it based on an attenuated theory of causation.  This court concludes that LINA relied on a legally proper Plan interpretation and that its denial decision is supported by substantial evidence.

**V.     Conclusion**

LINA's motion for summary judgment is granted.  Hannan's motion for partial summary judgment is denied.  Final judgment is entered by separate order.

SIGNED on June 13, 2005, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge